I3MHOFFC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   OFF-WHITE LLC,

4              Plaintiff,

5         v.                          18 Civ. 2099 (LGS)

6
    A445995685, et al.,
7                                     Conference

8              Defendants.

9   ------------------------------x
                                     New York, N.Y.
10                                   March 22, 2018
                                     12:00 p.m.
11
    Before:
12
                    HON. LORNA G. SCHOFIELD,
13
                                     District Judge
14
                         APPEARANCES
15
    EPSTEIN DRANGEL LLP
16       Attorneys for Plaintiff
    BY:  MARY C. BRENNAN
17       JASON DRANGEL

18  MAVRONICOLAS & DEE LLP
         Attorneys for Defendant Trendy_World
19  BY:  PETER CARO DEE

20  DEWEY PEGNO & KRAMARSKY LLP
         Attorneys for nonparty ContextLogic
21  BY:  DAVID S. PEGNO
         - and -
22  BARNES & THORNBURG LLP
    BY:  DWIGHT D. LUECK (via telephone)
23
    ALSO PRESENT:   DEVANG SHAH, In-house Counsel Wish.com (via
24  telephone)

25
```

I3MHOFFC

1          (In the robing room)

2          THE DEPUTY CLERK:  Good morning.  Mr. Lueck and

3   Mr. Shah, are you there?

4          MR. LUECK:  We are.  Thank you.

5          THE DEPUTY CLERK:  We're here before the Honorable

6   Lorna G. Schofield, in Off-White LLC v. A445995685, et al.  For

7   the plaintiff, we have Mary Kate Brennan and Jason Drangel. For

8   nonparty, ContextLogic, we have David S. Pegno and Dwight Lueck

9   and Devang Shah.  Mr. Lueck and Shah are on the phone.  And for

10  Trendy_World, we have Peter Dee.

11          We can begin.  Thank you.

12          THE COURT:  Good morning.  Sorry for the delay.  I

13  noted that late yesterday there were filings by one of the

14  restrained parties, which is ContextLogic, as well as a

15  response to that opposition.  They were filed late, so I

16  haven't had a chance to study them, but I have looked at them.

17          I think maybe the best way to do is for me to start

18  with ContextLogic.  As I understand it, the scope of the

19  preliminary injunction would bar ContextLogic from contributing

20  on the Wish platform goods being sold by any of the defendants

21  and not simply goods of Off-White.  Is that essentially what

22  the dispute is about?

23          MR. LUECK:  Yes, your Honor.  Dwight Lueck on behalf

24  of ContextLogic.  Thank you for allowing us to participate by

25  phone.  It's an unusual year when there are more debilitating

1    blizzards in New York City than in Indiana.

2              THE COURT:  I'll just say, as a Hoosier myself, I know

3    that from personal experience.  The weather's been very odd.

4              Go ahead.

5              MR. LUECK:  Yes, the issue here is focused on Section

6    1(a) (6) on page 12 of the TRO, which would restrict

7    ContextLogic and other platform providers from allowing the

8    defendant merchants to offer any products over the platform,

9    including products that in no way infringe on the Off-White

10   rights.  We are not before the Court today to challenge any of

11   the other provisions.  In fact, there is a provision that

12   requires total freezes of assets, including assets that may

13   have been derived from not infringing sales by the defendant

14   merchants.  We are not seeking reconsideration of that point.

15   We are only seeking reconsideration of the point which would

16   allow all 161 of these merchant stores to be taken down.

17   Currently, there are approximately 200 live posts, 200 valid

18   live posts on the Wish trading platform of these merchants that

19   do not infringe on the Off-White marks.

20             THE COURT:  Just so I understand that, you mean

21   they're not Off-White products; they're totally unrelated

22   products, is that what you're saying?

23             MR. LUECK:  That's correct, your Honor.  Everything

24   from socks to electrical devices to phone cases.  It's just a

25   huge range of products.

1          THE COURT:  Under other brand names, right?

2          MR. LUECK:  Yes, if any brand names at all are used.

3     Most often merchants are not offering branded products.  It's

4     just a picture of some stylish socks that do not include the

5     Off-White mark and marketed as socks.

6          THE COURT:  Let me interrupt you for a second.  Your

7     argument has greater intuitive appeal.  I understand Judge

8     Pauley didn't necessarily agree, ultimately, in a case that he

9     had, so perhaps I should hear the other side.

10          MS. BRENNAN:  Thank you, your Honor.  And I appreciate

11     you mentioning the case before Judge Pauley, because our

12     argument would be very similar in this matter as our reading of

13     ContextLogic's argument.  The primary issue that we have here

14     is that without the complete restraint --

15          THE COURT:  Let me just interrupt you for one second.

16          Was that Mr. Lueck on the phone who was talking just

17     now?

18          MR. LUECK:  Yes, your Honor.

19          THE COURT:  I just want to make sure you can hear.

20     Can you hear Ms. Brennan?

21          MR. LUECK:  Yes.

22          THE COURT:  Go ahead.

23          MS. BRENNAN:  Without the complete restraint on the

24     user accounts and merchant Wish has that no mechanisms in place

25     that would prohibit a defendant from just putting up another

I3MHOFFC

1    posting and then continuing to sell products that infringe

2    Off-White's trademarks.  We could just continue to go on, and

3    if that happened, there's nothing that would prevent a

4    defendant from just continuing its counterfeiting activities.

5              THE COURT:  Let me just ask Mr. Lueck about that.

6    Obviously, if there were a preliminary injunction in place,

7    your client would be acting under risk of contempt of court if

8    it allowed further postings of Off-White goods, and so I would

9    think that you wouldn't want to put your client in that

10   position if they couldn't abide by the order.  So tell me how

11   you would propose to do that.

12             MR. LUECK:  Your Honor, the trading platform has in

13   place a system that provides the posts will be taken down

14   promptly if parties -- if the trading platform is made aware of

15   those.  In addition, it has a policy in place concerning

16   suspension and termination of merchants that provides that if a

17   merchant does repost products, there will be sanctions.  Those

18   sanctions are not immediately published, but if we were to find

19   that a merchant had, in fact, violated the TRO, that would

20   result in some quick action.

21             THE COURT:  OK.  Let me just interrupt.  It wouldn't

22   just be they who had violated the TRO.  I think it would also

23   be your client that had violated the TRO.  So what mechanism do

24   they have in place to ensure that there isn't reposting?

25             MR. LUECK:  The client does screen -- we use the

I3MHOFFC

1    phrase "screen" -- the defendant's merchant stores to determine

2    whether any product on those stores is allegedly infringing or

3    appears to have allegedly infringed.

4         THE COURT:  What does that mean, "screen"?  Does your

5    client have sufficient confidence in the screening that they

6    are willing to be in contempt of court if they don't notice or

7    observe that something has been reposted?

8         MR. LUECK:  Yes, your Honor.  At this point we

9    wouldn't concede that we would be in contempt.  I think there

10   may be some questions as to that, but if we were, we would

11   certainly be prepared to take the risk of that based on the

12   current screening system that we have in place.

13        THE COURT:  I'll let Ms. Brennan continue.

14        MS. BRENNAN:  Your Honor, I would just draw your

15   attention to the two exhibits which we attached to our letter

16   that we submitted to the Court yesterday in response to

17   ContextLogic, Exhibit B.

18        THE COURT:  Which I don't have.  So just go ahead

19   and --

20        MS. BRENNAN:  I have a copy I can provide.

21        THE COURT:  Thank you.

22        MS. BRENNAN:  I'm going in reverse order here, but

23   Exhibit C.

24        THE COURT:  Thank you.

25        MS. BRENNAN:  You're welcome.

I3MHOFFC

1          THE COURT:  And Exhibit B?

2          MS. BRENNAN:  Yes, your Honor.  Exhibit B shows

3     situations as of yesterday and quite late in the afternoon.

4     These are the defendant's -- the infringing listings which are

5     identified in both Exhibit C to the complaint and Schedule A to

6     the TRO.  In situations where the infringing listing by a

7     defendant is still posted actively on Wish.com, in Exhibit B

8     specifically, you can click through and purchase a product as

9     of late last night.

10          Exhibit C is a sampling of infringing listings, again,

11     which were identified in both Exhibit C to the complaint and in

12     Schedule A to the TRO.  These infringing listings are still

13     available on Wish.com.  However, you can see from the

14     screenshots when you go to click through it says "Sold out."

15     We believe this is just as problematic as the active listings

16     because Wish then prompts users, or customers, utilizing

17     Wish.com to go to other sellers who are most likely not

18     defendants in our action and purchase the infringing product

19     through them.

20          THE COURT:  It also suggests that these goods are

21     available at these prices, which I suspect is not good for your

22     client's business model.

23          MS. BRENNAN:  No.  Off-White, just a bit of

24     background, is a luxury streetwear designer.  It's incredibly

25     popular.  Designer Virgil Abloh is written up everywhere.  As

I3MHOFFC

1   submitted in our application, products are sold everywhere,

2   from Barney's to boutiques.

3        THE COURT:  Let me ask Mr. Lueck about that.  I'm

4   looking at Exhibit B and C, which I assume you have since --

5   actually, they're not online.  Are you sure Mr. Lueck has them?

6        MS. BRENNAN:  I believe so.

7        MR. LUECK:  Yes, your Honor, Ms. Brennan provided us

8   with copies of those last evening.  And to the extent we have

9   had an opportunity to look into those matters, as to the first

10  exhibit, Exhibit B, there are six postings that are shown

11  there.  Those have all been taken down or, because of the time

12  difference between San Francisco and here, are in the process

13  of being taken down, and a rescreening of all of the defendant

14  merchants is going forward.

15       THE COURT:  Wait.  Just wait.  But that sounds, then,

16  like the TRO was violated and doesn't give me any comfort that

17  your client would be able to screen in order to comply with a

18  preliminary injunction.

19       MR. LUECK:  Your Honor, I have not had an

20  opportunity -- or the client has not had an opportunity fully

21  to go back and determine the history for each of these six

22  posts.  It appears that they -- Ms. Brennan has certainly

23  represented that they're still live.  So to the extent that

24  that's the case, we're taking action promptly.  So we have not

25  had an opportunity to go back and determine, for example,

1    whether the posts were taken down, but there's some lag time.

2              THE COURT:  So tell me about the screening process.

3              MR. LUECK:  The screening process applies examinations

4    of use of word marks such as "Off-White" and, to the degree

5    that the technology is present, also will allow for screening

6    of images, to the extent that the same images are being used in

7    a subsequent post.  That screening takes place on a regular

8    basis.

9              THE COURT:  Just so I understand, you have some

10   technology that will use digital screenings to screening for

11   words like the word "white" and to screen for specific images;

12   is that what you're saying?

13             MR. LUECK:  Yes.  In this instance, just screening for

14   the word "white" would create a lot of false positives, but

15   "Off-White" is being screened for.  And, yes, to the extent

16   that that phrase is found to be used, those posts are tagged

17   and examined promptly by screeners and taken down if they're an

18   Off-White product.

19             THE COURT:  I just note there's no hyphen in Off-White

20   in these posts.  Are they also screening for "off white"

21   without a hyphen?

22             MR. LUECK:  I cannot immediately speak to that, your

23   Honor, and that is a possible reason for how these posts made

24   it through without being captured.

25             THE COURT:  Well, then it sounds like they could also

I3MHOFFC

1    perhaps have "off" with two spaces and "white" and it wouldn't

2    be picked up by your screening.

3              MR. LUECK:  I can't speak to that particular issue.  I

4    believe there is the ability to screen with a space between.  I

5    cannot speak to whether that was exercised in this specific

6    incident without getting facts from people.

7              THE COURT:  Tell me again about the extent of the

8    legitimate, so-called legitimate, postings by the defendants in

9    this case on Wish.

10             MR. LUECK:  Certainly.  There are 161 named

11   defendants.  In the time that they have engaged in transactions

12   on the Wish trading platform, they have offered a total of

13   $41 million in product.  Over $38 million of product is not

14   product that in any way is being disputed by Off-White as

15   allegedly infringing on their trademarks.  That product, as I

16   indicated earlier, is a wide variety of product, including

17   electrical devices, wearing apparel that in no way has these

18   trademarks, as well as other products.  There are currently

19   200 -- there were at the time the person looked at it, created

20   a number of couple days ago, 200,000 posts from the remaining

21   merchants.

22             THE COURT:  But let me ask Ms. Brennan a question.

23   Does Off-White sell only clothing?

24             MS. BRENNAN:  They do not.  I mean, it is a luxury

25   brand, and you will see from the Exhibit C that it's everything

I3MHOFFC

1    from socks to hats and beyond, but there are things like phone

2    cases, a pill case.  It's a very comprehensive brand.  It's not

3    just sweatshirts and T-shirts.

4            THE COURT:  What I hear Mr. Lueck saying is that the

5    breadth of the order would affect them in a negative way

6    because of the extent of the postings by the defendants.  Do

7    you want to address that?

8            MS. BRENNAN:  I would, your Honor, and I'd also like

9    to provide you with a copy of the most recent discovery that we

10   received on March 20 from Wish, and I think that this is

11   important.  I'll take a step back and say, one, there's a lot

12   of conflicting evidence that we've received from Wish.  This is

13   the second set of information.  We received the first similar

14   data sheet on March 13, 2018 -- and I apologize, I do not have

15   a copy of that today -- which shows the first set of data that

16   we received on March 13, 2018.  Appears to only cover one

17   infringing listing for each and every defendant, whereas --

18           THE COURT:  I don't even understand what the document

19   is.  So just explain it.

20           MS. BRENNAN:  I will do my best, because it's not

21   ours.

22           THE COURT:  Not your document, I understand.

23           MS. BRENNAN:  And we've also had a hard time figuring

24   it out.  But I'll draw your attention to where it says

25   "Merchant ID number."  That would correspond with the

1    defendant.  Unfortunately, the way the information is provided

2    to us by Wish, we have to go back and put it together, but I

3    don't have that done yet.

4            THE COURT:  OK.

5            MS. BRENNAN:  But then the infringing product ID,

6    which is the first column, it is our understanding that that is

7    an identification of an infringing product that bears one of

8    the Off-White trademarks.  A major issue that we just --

9            THE COURT:  What's each separate line?

10           MS. BRENNAN:  We believe each line is an individual

11   infringing product listing.

12           THE COURT:  So these are all separate products, not

13   just sales of the same products?

14           MS. BRENNAN:  That's what we believe.  I guess --

15           THE COURT:  Mr. Lueck, can you help us at all?

16           MR. LUECK:  Each of the separate product listings, it

17   is possible that it is the same product being listed over time

18   more than once.  Without getting into the product listings

19   themselves, it's difficult to know that, but each is a separate

20   product listing.  We call it CIT.

21           THE COURT:  OK.  Go ahead.

22           MS. BRENNAN:  Our concern is the information provided

23   by Wish to date is supposed to cover all of the infringing

24   listings.  Our evidence shows that in certain cases that has

25   just not happened yet.  This evidence that we received most

1   recently, there are 14 defendants for which on this spreadsheet

2   we've received no information for at all.  In addition, there

3   are four defendants which we did receive information from Wish,

4   but that Wish will say there's only one infringing listing;

5   whereas, the evidence, which is Exhibit C to the complaint,

6   clearly shows that that defendant had at least two additional

7   infringing listings.  So we're dealing with information that we

8   don't believe to be completely correct at this time.

9        And our concern, to go back to why we believe it's

10  truly inappropriate for anything short of a complete merchant

11  storefront restraint, is because we don't know, there's some

12  instances where our data shows, the evidence in the

13  screenshots, Exhibit C to the complaint, it's clear there are

14  multiple listings.  Here, it's clear there are multiple

15  listings, and we just don't think we have even come close to

16  knowing truly how many listings and product sales for the

17  infringing products that have been offered.  We're nowhere

18  close to knowing that at this point, but I think --

19       THE COURT:  What about the impact argument that

20  Mr. Lueck has alluded to?

21       MS. BRENNAN:  I understand that's something that, I

22  think, Judge Pauley in the prior case covered quite clearly

23  that, comparatively, 161 storefronts -- and I do want to note

24  that of 161 defendants, we have only one defendant here today

25  to object to anything at all.  So percentage-wise on that point

I3MHOFFC

1   is very, very small.

2            But to get to your question about the impact, 161

3   storefronts compared to the hundreds of thousands to millions

4   of storefronts that are available on Wish, it's a very, very

5   minor percentage.  And we don't believe that that should cause

6   any undue burden on Wish.

7            THE COURT:  Do we know what the percentage is,

8   Mr. Lueck?

9            MR. LUECK:  I'm sorry.  The percentage of what, your

10  Honor?

11           THE COURT:  The defendants at issue here who post on

12  Wish versus the universe of vendors on Wish.

13           MR. LUECK:  I do not have that number before me.  I

14  know that there's been $43 million -- $42 million of

15  transactions in total over time.

16           THE COURT:  But I don't know how long that is or

17  42 million out of what?  If it's 42 million out of 43-, that's

18  one thing, but if it's 42 million out of hundreds of millions,

19  then it's something else.

20           MR. LUECK:  Well, your Honor, I think we're looking at

21  a false comparison here.  I know Judge Pauley did this in his

22  analysis.  Wish is not the defendant here.  Wish is the trading

23  platform, and what we are looking at is an injunction that

24  would potentially shut down 161 merchant stores.  The impact on

25  those stores is 100 percent over time of the noninfringing

1    products that have been offered over 1 million U.S. users that

2    have purchased those products, and one point --

3           THE COURT:  Wait, wait.  But you only have standing to

4    talk about your client, and your client is ContextLogic.  And

5    it operates the Wish platform, is that right?

6           MR. LUECK:  We come as the party Wish, which is an

7    impacted party, although, ultimately, Ms. Brennan and

8    plaintiffs still bear the burden of establishing that the

9    preliminary injunction is appropriate and that the scope is not

10   a scope that will harm defendants, impacted parties, or the

11   public.

12          THE COURT:  OK.  Ms. Brennan, do you want to state

13   your best case for why you've met your burden of proof.

14          MS. BRENNAN:  I mean, I think, your Honor, our

15   comprehensive pleadings and our application, which originally

16   we already asked for the TRO, would be why we'd ask that to be

17   converted into a preliminary injunction order because of the

18   irreparable harm to our client that is caused by the constant

19   and pervasive postings of products that infringe my client

20   Off-White's trademarks.

21          THE COURT:  Can you address the scope issue of the

22   particular paragraph we're talking about.

23          MS. BRENNAN:  Sure, which is -- let me just pull up

24   the paragraph itself, page 12 of the TRO.

25          THE COURT:  And it's paragraph 1(a) (6).

I3MHOFFC

1          MS. BRENNAN:  Which states, "within five days after

2     receiving actual notice of this order, providing service to the

3     defendants, defendants user accounts, and defendants merchant

4     storefronts, including without limitation, continued operation

5     of defendants' user accounts and merchant storefronts."  In

6     effect, what we're asking for is the complete restraint on the

7     merchant storefronts and user accounts.

8          I think that the evidence is very clear that Wish has

9     no mechanism whatsoever -- I understand and I hear Mr. Lueck's

10    comments about how they might do a screen, but it's clearly

11    been ineffective.  We were told and there were representations

12    to both us individually and to the Court that every single

13    infringing listing of these 161 defendants was removed as of

14    Monday, but as of yesterday, I could go on and buy a

15    counterfeit Off-White product from a variety of defendants, and

16    I think that's a major problem.

17          THE COURT:  Based on what I've heard from the

18    plaintiff and from ContextLogic, I am rejecting the objection

19    of ContextLogic.  It seems to me that the plaintiffs have met

20    their burden with respect to the factors that warrant a

21    preliminary injunction, but particularly with respect to the

22    scope of paragraph 1(a)(6), because of very concrete evidence

23    that's just been put before me that this so-called screening by

24    ContextLogic is not effective.  And, in fact, ContextLogic, on

25    its Wish platform, has been in violation of the temporary

I3MHOFFC

1    restraining order in continuing to post infringing Off-White

2    products.

3            So, for all those reasons, I will enter an order today

4    granting the preliminary injunction.  I would note that there

5    were no other objections by defendants and no other appearances

6    by defendants.

7            MR. DEE:  Might I say something?

8            THE COURT:  Yes.

9            MR. DEE:  I do represent one of the individual

10   defendants, Trendy_World.

11           THE COURT:  Did we know that?

12           MR. DEE:  Yes, I filed something by email last night.

13   We were not able to file it online on ECF.

14           THE COURT:  OK.

15           MR. DEE:  That is a spreadsheet there that I filed.

16   It's Exhibit A to this declaration.  I'm not sure if you have a

17   copy.

18           MR. DRANGEL:  It literally came in at midnight.

19           MS. BRENNAN:  Exactly midnight.

20           MR. DEE:  I would say 11:59.

21           THE COURT:  OK.  In any event.

22           MR. DEE:  Just speaking on behalf of my client only.

23           THE COURT:  What is your client?

24           MR. DEE:  Trendy_World is one of the merchants on the

25   Wish.com platform.

I3MHOFFC

1          THE COURT:  OK.

2          MR. DEE:  To speak to the overall argument regarding

3     the fact that some new postings have been made, first of all,

4     Trendy World has taken down the one sole product that is

5     alleged to be infringing here, grip socks.  Perhaps they sell

6     it for $80 normally.  My client had only made, and it's set

7     forth in the declaration $600, just over $600, total on the

8     sales of, I think, about 300 orders.  Their total revenue

9     overall during the same time period of those sales was, as set

10     forth in paragraph 5, $527,000.  So the sales of the allegedly

11     infringing socks represent .13 percent of the total revenue

12     during the same time period.

13          The socks have been taken down.  A preliminary

14     injunction preventing the account to go forward would be

15     irreparable Harm on my client's business.  So, at the very

16     least, we would seek a carve-out of that particular defendant.

17     I think it -- I'm the only attorney here representing one of

18     the defendants.  They're here to -- they're appearing, they're

19     here to defend their rights.  Certainly, I think, preventing

20     any of these users, and certainly the defendant that I

21     represent, from operating on the website would go beyond what I

22     think is a narrowly tailored solution to what the plaintiffs --

23          THE COURT:  I'm going to interrupt, and let me hear

24     from Ms. Brennan.

25          MS. BRENNAN:  Sure.  I think the most important thing

I3MHOFFC

1    to point out is -- and we did receive this information very,

2    very late last night -- but based on the data which Wish

3    provided to you, which you have a copy of, as of March 20,

4    2018, it shows that the product lifetime or total units sold of

5    this one particular infringing Off-White product was 2,153.

6    So, obviously, there's a major discrepancy with what this

7    defendant has put forth.  And the total product lifetime value

8    we have at $5,305.70.

9        I do want to note that based -- and this is a major

10   discrepancy we have with Wish in general, which I discussed

11   earlier in terms of the evidence, is that we received a prior

12   spreadsheet on March 13, 2018, which showed that the merchant

13   balances are varied.  So back on March 13, 2018, the current

14   merchant value for defendant Trendy_World was $128,010.12.

15       THE COURT:  I'm just going to interrupt.

16       MS. BRENNAN:  Sure.

17       THE COURT:  You really haven't had a chance to respond

18   to this.  What I will do is the TRO is in place until today.

19       MS. BRENNAN:  Today.

20       THE COURT:  I think what I should do, the TRO is in

21   place, I am going to enter the restraining order, but I will

22   give both sides leave to put in an additional letter by, let's

23   say, next Wednesday.  And try to talk to each other just to

24   figure out what the numbers are, because it doesn't help me

25   very much to have a very small number from here and a very

I3MHOFFC

1    large number here, and I have no idea what is right, and

2    then if you can, try to work something out.  But if you can't,

3    in any event, send me a letter on Wednesday, tell me where you

4    stand.  You can do that by filing it on ECF, and I will

5    consider that as an application by your client Trendy --

6            MR. DEE:  Trendy_World.

7            THE COURT:  -- Trendy_World to carve it out of the

8    preliminary injunction, and I will consider it based the

9    letters.

10           MR. DEE:  Thank you.

11           MS. BRENNAN:  Thank you, your Honor.

12           THE COURT:  All right.  Thank you.

13           MS. BRENNAN:  Just one, I noticed that you mentioned

14   that we would be able to file next Wednesday on ECF.  Do we

15   need -- from our end, would you like us to do anything about

16   unsealing the case at this time, because we do believe it would

17   be appropriate to be unsealed now?

18           THE COURT:  You should unseal it at this point.  Do

19   you need an unsealing order from me?

20           MS. BRENNAN:  I can prepare one for you and submit it

21   to you.

22           THE COURT:  I also need a form of order for the

23   preliminary injunction to be sent to me in Word, and you should

24   file it on the docket so everybody who's involved can see it.

25           MS. BRENNAN:  OK.  I will submit that to you when I

I3MHOFFC

1    return to the office, and as soon as the case is unsealed, I'll

2    be able to ECF that.

3            THE COURT:  Great.  Thank you.

4            MS. BRENNAN:  Thank you, your Honor.

5            (Adjourned)